COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges O'Brien and Causey
Argued at Lexington, Virginia


CHINA LYNN WASHINGTON

                                                MEMORANDUM OPINION* BY
v.        Record No. 0739-23-2            JUDGE MARY GRACE O'BRIEN
                                                 AUGUST 13, 2024

BUCKINGHAM COUNTY DEPARTMENT OF
 SOCIAL SERVICES


           FROM THE CIRCUIT COURT OF BUCKINGHAM COUNTY
                      Donald C. Blessing, Judge

           Roger B. Stough for appellant.

           E. M. Wright, Jr.; Carter Allen, Guardian ad litem for the minor
           children (Elder, Watkins, Friedman & Allen, P.C., on brief), for
           appellee.


      China Lynn Washington (mother) appeals the circuit court's orders terminating her parental

rights and approving the foster care goal of adoption for two of her children, C.W. and D.W.

Mother argues that the court erred in finding that the termination of her parental rights was in the

best interests of the children.  She also contends that the court erred in finding sufficient evidence to

terminate her parental rights under Code § 16.1-283(B) and (C)(2).  For the following reasons, we

affirm.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).

Mother and Jeremy Antonio Washington (father)[2] are the biological parents of five children: two who are subjects of this appeal (C.W. and D.W.) and three who are not (A.W., J.W., and B.W.).[3] The Buckingham County Department of Social Services (the Department) first became involved with the family in 2017, when A.W. witnessed domestic violence between the parents. The family subsequently moved to Culpeper County, where its Department of Social Services received four reports and found that the parents were "unable to appropriately care for the children's needs for shelter, food, clothing, and hygiene." As a result, the children lived with their paternal grandmother for six months until they could return to their parents' custody.

In December 2020, mother and the children moved back to Buckingham County, and the Culpeper County Department of Social Services transferred the ongoing cases to the

---

[1] The record in this case was sealed. "[T]his appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022). We unseal only the facts included in this opinion; the rest of the record remains sealed. *Id.*

[2] Father also appealed orders terminating his parental rights and approving the foster care goal of adoption. *See Washington v. Buckingham Cnty. Dep't of Soc. Servs.*, No. 0653-23-2.

[3] A.W. and J.W. were living "with the maternal grandparents" and not in mother's and father's custody. B.W. was born while the foster care case was pending; the child was ten months old and living with mother and father at the time of the circuit court hearing.

Department.[4]  At the time, A.W. was eight years old; C.W. was almost three years old; J.W. was two years old; and D.W. was four months old.  The Department's "immediate" concern was the family's home, which had "holes/gaps in the floor, exposed electrical wiring, gaps in the walls, and unobstructed access to the hot water heater."  In addition, the home's "cleanliness was always an issue."  On March 10, 2021, the Department discussed the issues with mother, who agreed to a safety plan that temporarily placed the children with the paternal grandmother again.  Mother fixed the hazardous issues within a week, and the children returned home.

Approximately six weeks later, mother took C.W. and J.W. to the hospital because she suspected that they had ingested A.W.'s medication.  Acknowledging that the incident was an accident, the Department nevertheless had concerns because of reports from the hospital about the children's lack of supervision and hygiene.  Although mother denied neglecting the children, she agreed to a safety plan that temporarily placed the three younger children with their paternal grandmother for a third time.  The Department initiated parent aide services and parenting classes, and the children returned home.

Less than a week later, the Department received a report of inadequate supervision involving the younger children "playing about 25 feet away from the road" and J.W. "sprint[ing] to the road, jump[ing] in and out of the ditch, and [standing] in the road before anyone could reach him."  One month later, the Department received another report that mother allowed then-nine-year-old A.W. to smoke her marijuana vape pen.  Despite the counseling sessions, parent aide sessions, parenting classes, and ongoing supervision and case management, mother

---

[4] Because father had pending criminal charges and "was on house arrest," he could not relocate with the family.

remained unable to care for the children. Thus, the Department removed the children and placed them in foster care.[5]

On July 20, 2021, the Buckingham County Juvenile and Domestic Relations District Court (the JDR court) entered emergency removal orders, followed by preliminary removal orders. The JDR court adjudicated that the children were abused or neglected and entered a dispositional order on September 13, 2021.[6]

After the children entered foster care, the Department established requirements for mother to complete before reunification. Mother had to obtain and maintain stable housing that was free of safety hazards. The Department referred mother to housing programs and provided her with the agency housing list; it also connected her with community resources that could assist with furniture and clothing. She had to demonstrate financial security, participate in a work-force training and counseling program, and apply for social security disability benefits. Mother had to complete a parenting education program and psychological, parental capacity, and substance abuse evaluations; she had to follow all recommendations. The Department provided mother with supervised visitation so that she could practice and implement "positive parenting" skills. The Department continued offering parent aide services. Participation in school meetings, medical and dental appointments, family partnership meetings, and monthly progress reviews was also mandatory. To address domestic violence and mental health concerns, mother was required to participate in marriage counseling and individual therapy and take all prescribed medication.

---

[5] Father was incarcerated at the time of the children's removal but released a few weeks later.

[6] Mother did not pursue an appeal of the abuse and neglect orders.

Mother completed her psychological evaluation in "a timely manner." The evaluator recommended that mother continue with counseling and the parent aide services, which she did. Mother also completed her parenting classes. Although mother reported that she and father participated in marriage counseling, the counselor told the Department that she had "never seen" the parents.

The Department provided weekly supervised visitation, which the parents regularly attended. Mother's interaction with the children was "always very good," although the Department expressed concern about inadequate supervision, especially when one child ran out toward the road and the parent aide had to catch him. Father's interaction, however, "varied" with each visit; he would often sleep or use his phone.

The parents did make progress toward the foster care goal of returning the children home. Beginning in March 2022, the parents had unsupervised visits with C.W. and D.W. The visits started as day visits and progressed to an overnight visit. The Department was considering a trial home placement until it learned that the parents were being evicted.[7] Mother had been paying rent to an individual who was not giving the money to the landowner; that individual faced criminal charges as a result. As they fought the eviction, mother and father continued to live in the house; however, they stopped caring for the house because it was no longer their "problem," and they allowed the grass to get "about waist to chest high." By August 2022, mother and father could not find any housing, so they moved to Culpeper to live with the children's paternal grandfather. Because the paternal grandfather would not allow children, mother and father gave temporary custody of B.W. to father's aunt until they found stable housing.

Mother stopped making significant progress on the requirements for reunification. The Department petitioned to terminate mother's parental rights because of her "inability to follow

---

[7] When this trial home visit was under consideration, mother had just given birth to B.W.

through with services, inability to obtain housing, [and] inability to accept responsibility" for the children in foster care. The Department also petitioned to change the foster care goal to adoption. On September 20, 2022, the JDR court terminated mother's parental rights to C.W. and D.W. and approved the foster care goal of adoption. Mother initiated an appeal to circuit court.

Following the JDR court's rulings, the Department continued to offer the parents supervised visitation. The parents were late to a visit in December 2022 and did not see the children again until March due to a lack of transportation. The foster parent arranged for some virtual visits during that time frame. In addition, the parents obtained housing in Fauquier County.

At the circuit court hearing, the Department presented evidence about C.W. and D.W., who were five and two years old respectively. The Department had placed them in the same foster home, where they had lived throughout the proceedings. Initially, C.W. had "a lot of behavioral issues," including cursing, spitting, fighting, and challenging authority. D.W., who was younger, did not display concerning behavior. Since entering foster care, C.W. had enrolled in school and was doing well. The foster mother described C.W. as a "loving little person" with a "warm personality." D.W. also was doing well in foster care. D.W. attended a daycare program and interacted well with other children.

The Department admitted that mother cooperated with the service providers, followed through with the recommendations, and was appropriate at visitations. Despite mother's cooperation, the Department explained that her relationship with father was a persistent issue and "impede[d] her ability to parent her children correctly." From the beginning of its involvement with the family, the Department had been concerned about domestic violence between mother and father. Throughout the foster care process, mother had provided "excuses" for father "all the

time." The Department noticed that mother was the "main provider" for the children, with "no help" from father. Mother, however, lacked capacity to care for all the children at one time without "a lot of help." The Department contended that despite all the services offered, mother had made "limited progress" in her parenting skills.

In addition to concerns about mother's parenting skills, the Department asserted that housing remained an issue. Aware that the parents had secured new housing three months before the circuit court hearing, the Department emphasized that there were ongoing concerns about the parents' ability to maintain a clean and safe home. The court heard evidence that the parents and B.W. had moved to a three-bedroom home in Fauquier County, with a yard and play area for the children. Due to a disability, father had obtained rental assistance through a program with the Rappahannock-Rapidan Community Services Board. Mother acknowledged that father could lose the assistance and the house if he stopped participating in the program, did not attend counseling, or stopped taking his medication.

Mother testified that her relationship with father had improved in the last two years and their new living arrangement was less "stressful." She conceded, however, that "everyone" told her that she would be "further along the line" if father were not present. Furthermore, although mother wanted custody of C.W. and D.W., she admitted that returning the children to her immediately was "not a viable option."

At the conclusion of the hearing, the circuit court found that the Department had made "more than reasonable and appropriate efforts" to help mother remedy the conditions that led to foster care placement. The court further found that the children were "flourishing" in foster care. Although mother had tried "to do the best" she could, the court found that she failed to make "substantial progress" and it was "not in the best interests" of the children to wait and see if she would be able to resume her parental responsibilities. The court further found that mother had

"not been successful in a significant time period, at least . . . 12 months, of providing a suitable, safe, stable environment for the children." The condition of their previous home was "deplorable," and the parents allowed it to deteriorate further after they had received the eviction notice. Although the Department had been involved with the family for years, mother failed to take sufficient advantage of the services offered to her. The court found that any progress made in the recent short term was "too little[,] too late," especially considering the children's need for stability.

The court entered orders terminating mother's parental rights to C.W. and D.W. under Code § 16.1-283(B) and (C)(2) and approving the foster care goal of adoption.

ANALYSIS

"On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

Mother challenges the sufficiency of the evidence to support the termination of her parental rights under Code § 16.1-283(B) and (C)(2). Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the

- 8 -

reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

Mother argues that she had substantially remedied the conditions that led to the children's placement in foster care and that termination of her parental rights was not in the children's best interests. She emphasizes that the Department had planned to schedule a trial home placement before the parents were evicted from their home and that their eviction was because the owner's agent had embezzled their rent money.

The evidence, however, supports the court's finding that mother had not substantially remedied the conditions that led to, or required the continuation of, the children's placement in foster care. The Department initially became involved with the family due to a report of domestic violence in 2017. Then, in 2021, the Department was concerned about their housing situation, the lack of supervision, the children's poor hygiene, and the parents' mental health. Mother and father never completed the required marriage counseling to address their history of domestic violence. According to the Department, mother's relationship with father had "impede[d]" her ability to parent the children. Father did not help her with the children, and mother could not manage all the children without "a lot of help."

Furthermore, although the parents were required to provide suitable housing, they let their home in Buckingham County deteriorate when they faced eviction, claiming it was no longer their "problem." Noting that even mother described the house as unlivable, the court questioned why the parents would allow such "deplorable" conditions while they still resided there with B.W. They

then lived with the paternal grandfather, who would not allow children, so they gave temporary custody of B.W. to father's aunt. Mother and father finally obtained housing approximately three months before the circuit court hearing, relying on father's assistance from the Rappahannock-Rapidan Community Services Board—assistance that was contingent on father's ongoing compliance with the program, counseling, and medication regimen. As the court noted, any progress made was "too little[,] too late." *See Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 171 (2014) (finding that a court "may discount the parent's current 'progress' if the best interests of the child would be served by termination" (quoting *L.G. v. Amherst Cnty. Dep't of Soc. Servs.*, 41 Va. App. 51, 56 (2003))).

"'[T]here is no simple, mechanical, "cut and dried" way' to apply the best interests of the child standard." *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 48 (2014) (quoting *Peple v. Peple*, 5 Va. App. 414, 422 (1988)). "Instead, '[t]he question must be resolved . . . in light of the facts of each case.'" *Eaton v. Washington Cnty. Dep't of Soc. Servs.*, 66 Va. App. 317, 331 (2016) (alterations in original) (quoting *Toombs v. Lynchburg Div. of Soc. Servs.*, 223 Va. 225, 230 (1982)). "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming [her] responsibilities." *Simms*, 74 Va. App. at 463 (quoting *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 162 (2004)).

Mother admitted she was not ready to resume custody of the children at the time of the circuit court hearing. The court emphasized that the children could not "wait indefinitely for some solution to pop up" because they needed stability and permanency. C.W. and D.W. had been in foster care for approximately 20 months, and the circuit court found that they were now "flourishing." Considering the totality of the record, the circuit court did not err in finding that the termination of mother's parental rights was in the children's best interests.

"When a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 568 n.9 (2018); *see also Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 8 (2005) (affirming termination of parental rights under one subsection of Code § 16.1-283 and declining to address another subsection). We find that the court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2); therefore, we do not consider whether mother's parental rights also should have been terminated under Code § 16.1-283(B).

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*